Our next case for argument is 21-2205 Sheehan Metals v. United States. Mr. Diedrich, please proceed. Thank you, Your Honor. May it please the Court. In this anti-dumping administrative review, mandatory respondent Pioneer Hardware submitted timely responses to Commerce's requests. Yet, relying on the condom-specific rule, Commerce applied total adverse facts available and assigned Pioneer the highest possible dumping margin. For two independent reasons, Commerce's decision is unlawful and requires remand. First, the condom-specific rule is unenforceable. It's a legislative rule that had to be promulgated through notice-and-comment rulemaking, but wasn't. And it's also inconsistent with the here was unsupported. Three years ago, this Court made clear in its BMW of North America case that when Commerce imposes an AFA-based margin, it must properly exercise its discretion and back up its decision with an adequate explanation and substantial evidence. Here, Commerce's decisions to apply total adverse facts to Pioneer and to impose the highest possible dumping margin both fail that standard. I'll turn first to the legislative rule issue. Rules under the APA must go through notice-and-comment unless they fit one of the APA's exceptions, such as statement of policy, procedural rule, or interpretive rule. But here, the condom-specific rule falls on the legislative side of the ledger. I have an unrelated question, just so I understand. You're not appealing the determination that your client failed to comply. You're appealing the determination that compliance was necessary. Is that fair? That is fair, and I'll clarify a little bit, Your Honor, if I may. When we responded to Commerce's request for information, we submitted a compliant separate rate questionnaire establishing independence from the Chinese government. We submitted a compliant U.S. sales database, and then we submitted factors of production data. It is undisputed that those factors of production data were not compliant with the condom-specific rule. So that part is not being challenged. However, we are challenging the consequence of what Commerce did after receiving our information. It's your view that your factors of production data, while not condom-specific, were sufficient? Do I have that right? It is, yes, and the basis for that would be twofold. It's number one that the condom-specific rule is unlawful, and therefore, in the absence, ours are sufficient. However, even if our data were somehow insufficient, under the rule, Commerce has decided to apply total adverse facts instead of what we view would be the more appropriate partial adverse facts in light of our other compliant responses, and that when the Department of Commerce chooses to apply adverse facts and then bases a margin on those adverse facts, it still has to go through substantial evidence and adequate explanation review, and so each step in that sequence fails. So partial adverse facts is more appropriate than total adverse facts. Did you raise this at the CIT? Did you raise a justification that Commerce needed to provide a justification for full adverse facts versus partial adverse facts? Yes, Your Honor. The argument that total adverse facts is unsupported by substantial evidence would appear at appendix pages, which are 9 and 1300 to 1304. Further, the court decided that, that's the trade court, looked at these issues and considered all of our arguments at appendix pages 9 through 18. As this court said recently in Bozeman Financial and Emineker, when a court below actually reviews an argument and passes on it below, that exempts any party from a waiver issue, and more just as importantly here, waiver is always a matter of discretion, and when issues like here, they're fully briefed and they will affect other parties, namely the 17 other non-mandatory respondents that would be affected by what happens to Pioneer here, it's especially appropriate for this court to consider all issues. So just to sort of tie the knot then on the partial AFA and the dumping margin, I referenced earlier this court's recent decision in BMW North America, which is a decision where it was appropriate for Commerce to apply total adverse facts, but yet this court sent it back to Commerce for a recalculation of the dumping margin, and there'd be multiple grounds here for doing so. For example, Pioneer got the same margin, 118 margin, as Tianjin Universal, which chose not to respond at all, didn't establish its independence from the Chinese government control, didn't submit any data compliant or not, and so that's a huge difference and goes to the, quote, levels of culpability that this court said is an important part of Commerce's rate setting determination in the BMW case. I think the analogy you're drawing to BMW is meaningful, but this argument, I worry, was in fact raised. Only place I see you ever mentioning whether or not the 118% rate is overly punitive is on page 1289, and you don't in that, you say only in the most general of sense, and you don't set forth any of the factors that you raise now for why it should be considered punitive, so I just don't personally see that you flush that out for the CIT. I think you forfeited it, so I'm sympathetic because I think that you've made a somewhat compelling argument on appeal about BMW, but I don't see it having been raised to the CIT. Sorry, so many different names here. I'm struggling to keep them all straight. Acknowledging your concerns, Your Honor, even if Your Honor finds that we did not sufficiently raise the issue in the trade court, which I would maintain we did, but even if you choose not to, I would still request that this court consider that because applying the BMW analysis would be a legal question. It doesn't change. I have a question for you, but see, I see what you're saying, your point about how waiver, when someone kind of vaguely mentions an issue before us, then we have some discretion to say whether there was waiver or not. I think it's a little different when an issue isn't raised before a tribunal whose decision we're reviewing, and then we're supposed to consider it for the first time. I don't know that I have discretion in that circumstance. Do you have legal support for the idea that I can just, so it doesn't matter that the court below, whose decision I'm reviewing, didn't know about this issue, I can go ahead and say that it's waived and can be raised before us for the first time? In this case, I think it would be appropriate for you to go forward for this reason, and that is because the application of the BMW analysis would be a legal analysis. It wouldn't require you to fact find, and also, this is de novo review. That was my other point. It's de novo review. It's a legal question, and because it's been fully briefed, if you compare our opening brief, particularly mid-continence response, and then our reply, we go back and forth on these issues and flesh them out, I think, quite thoroughly. With that, then, returning to the legislative rule issue, the condom-specific rule effectively amends a prior legislative rule, which is one of multiple indicia of a legislative rule that the D.C. Circuit- What do you think it's amending, the regulation or the statute? A regulation, 19 CFR 350- Why is it not just elaborating how commerce is interpreting that statute, or how it's going to understand it in this particular case in order to fulfill its duty of trying to accurately calculate the anti-dumping margin? Yes, Your Honor. Two separate issues, just to clarify first. One is effectively amending an existing legislative regulation. The separate question would be the statute. I take your question to be asking about both, perhaps. I'll talk about the statute first. I think this goes to the question of whether or not the rule is interpretive, and it's just fleshing out the duty. I refer the Court to the D.C. Circuit's recent decision, relatively recent decision in Catholic Health Initiatives. In that case, the D.C. Circuit looked at a rule that, I believe it was CMS, the Medicare agency, was arguing was an interpretive rule. In that case, the agency said, this is an interpretive rule that is elaborating on statutory language about, quote, reasonable cost. The D.C. Circuit said that that type of statutory language was too open-ended for an agency to derive a mere interpretive rule. Assuming it has the authority to do so, when an agency interprets that type of open-ended language, it is necessarily acting in a legislative rule capacity. Here, the statutory language at issue is very, very, very close. 1677B, I can get you the subsection if you need it, is reasonably reflect cost of production. So, the D.C. Circuit said reasonable cost can't support an interpretive rule. Here, we would have reasonably reflect cost of production, which we submit also cannot support a mere interpretive rule. The D.C. Circuit also called out similar statutory phrases like fair and equitable, just and reasonable, and the like. The rule, also then to finish the point about the effectively amending an existing regulation, 19 CFR 351.401 sub G, it uses mandatory language, quote, or commerce, excuse me, quote, will take into account the records maintained by the party in question in the accounting practices, end quote, of the country in question. The condom-specific rule, by contrast, requires commerce to look only at condom-specific reporting, regardless of how a company keeps its ordinary course records, and regardless of generally accepted accounting practices in a given country. That relates very closely to the Batterton test from the D.C. Circuit, which speaks about constricting the discretion of agency officials. Commerce officials don't have at least the same level of discretion they had before the condom-specific rule to consider records like Pioneer's. That makes this case like the Crop Life case from the D.C. Circuit, in which the EPA announced a rule that it would no longer consider a category of information. The D.C. Circuit said that because the agency's lopping off an entire category of potentially relevant information, that was, that amounted to a legislative rule. Final point on this is, thank you, Your Honor, just one more point, would be the idea that this rule is not just about what commerce does after it receives records from parties, like the Stuck case, for instance, about commerce's internal calculation methodologies. This rule on its face and in its application tells parties how they have to maintain records and then how they have to report records, so it imposes a legal obligation and a duty on parties. I'll reserve the remainder of my time for Mr. Kupera. Good morning, Your Honors, and may it please the Court. This Court should affirm the ruling of the trial court for two reasons. First, the condom-specific reporting requirement is a statement of policy that comports with the statute. It is not a legislative rule. Second, substantive evidence supports the trial court's conclusion that Pioneer failed to cooperate with the investigation by not acting to the best of its ability to provide the information requested by commerce. I'd like to first turn to the legislative rule and a couple of points that were just made by counsel. First, with regard to the issue of whether or not the condom-specific reporting requirement comports with the statute, we turn to the plain language of the first sentence of 1677B, paragraph F1, subpart A, and I'm particularly looking at the second part of that sentence where it says, and reasonably reflects the cost associated with the production and sale of the merchandise. Commerce explained that it requires condom-specific reporting data in order to make a determination as to what the cost of the merchandise is when it's making its comparison between normal value and export price. So the reporting requirement on its face comports with the statute. Was that reporting requirement specific to this particular investigation, or was it just more general for all investigations? It's been used in, the short answer is it's specific to this investigation, though it has been used in other contexts, and this is a key difference between the condom-specific reporting requirement and what would normally be a standard in all investigations or reviews. It's typically been used in non-market economy situations, but this, again, leads to another point that was just raised, is the use of the condom-specific reporting requirement is, in fact, commerce officials exercising their discretion in terms of the information they need in order to conduct their analysis. So, turning back to the original question, yes, commerce requested this information in this particular investigation or administrative review, I should say. They requested it here because it was necessary. And they had given notice, I guess it was 2005 or something, or 2013, I'm sorry. Yes, so this was the... And that's when they issued their original statement, they were going to require this in this certain steel nails case. Yes, that's correct, so this was the 10th administrative review. They had been requiring this information since the third administrative review. And as we mentioned in our brief, there have been other situations throughout the course of the administrative reviews of this investigation where other parties who did not keep their books in a condom-specific fashion had, in fact, provided condom-specific information after commerce had requested it. So, again, this isn't a requirement that's some impossible bar to get over, which, again, brings back the particular facts of this case, which is that, again, Pioneer was on notice, the requirement having been in since the third administrative review. Is there a difference in assessing whether this is a legislative rule between a determination that it simply impacts reporting obligations or requirements versus substantively requires parties to maintain certain records they might otherwise maintain or produce or create or something? I mean, do you understand? Is there a difference for assessing whether it's a legislative rule if I determine this isn't just a reporting requirement of data you may have, this is actually a substantive requirement that you maintain data you would not have maintained? Does that impact it? Yes, there could be a difference there, Your Honor, but I think it's a key difference that the reporting requirement does not obligate companies to change how they keep their books moving forward, and that's demonstrated in the record by the fact that Commerce requested the condom-specific information and Pioneer refused to provide it, and Commerce came back again and said, okay, if you don't have the information, then please develop a methodology based on the data that you do have to provide us with the information or some type of reasonable estimate. So that ability to take the data that they do have and create a methodology that would be responsive to the request means that they are not obligated moving forward to change the manner that they keep their books, and this again brings me to... And when Commerce said to them, come up with a methodology then that sort of approximates as closely as possible what we're looking for, what was their cursory response that essentially said, no, we're not going to do that. I can find these. No, we're not going to do that or we don't maintain records such that we'd be able to do that. Which one? I'd have to look at the precise quote, Your Honor, but it was a very cursory response that said, we do not maintain our records in that fashion and therefore cannot respond. So I apologize, I don't have the precise quote in front of me from... It was the second questionnaire that Commerce sent out. It was discussed in the Issues and Decisions Memorandum in the appendix at pages 76 and 77 is where Commerce discussed that particular point. But again, this raises the issue that I would like to point out that because Commerce is not requiring the company to change how it's reporting its information, that runs directly contrary to this argument that by requesting condom-specific information, this is somehow amending a previous regulation. Commerce wasn't discounting or saying that GAP-compliant records no longer have any meaning. In fact, looking back to the statute itself, that initial sentence that I quoted earlier is in fact conjunctive. It says, costs shall normally be calculated based on the records of the exporter or producer of the merchandise if such records are kept in accordance with GAP and reasonably reflect the costs associated. So you need to have both. So it's not discounting GAP or changing the regulation. It's in fact looking for... It's asking the companies to report on data that Commerce needs for its analysis. I'd like also to turn to respond to the issue raised by the citation of the BMW case. And there's a couple of key differences here between the instant case and BMW. In BMW, we had a respondent where there was... Let me back up a half step. The facts of that case are significantly different. And the key issue is, as this court noted, that there were some procedural irregularities in the investigation. The investigation had been paused and then restarted. And BMW was arguing that because of that procedural irregularity, I believe there was also a change of counsel or a change in mailing address, that essentially they were saying that they were completely unaware that the investigation had restarted and that was the reason for their noncompliance with Commerce's requests. That is not the situation we have here. As I mentioned earlier, Commerce sent these requests to Pioneer and Pioneer responded with these very cursory denials saying that, no, we don't have the information and won't provide it. And furthermore, that when they offered the opportunity to develop an estimation of the required information, they didn't undertake to provide that either. Further, they didn't provide an explanation as to why it wasn't possible for them to do so. As I mentioned before, there have been other companies in the course of this gap-compliant books to create a methodology to respond. Pioneer didn't do those things. I'm a little confused. One of the concerns I thought they were raising in relationship to BMW was that Commerce really didn't articulate or address specifically why this, the absolute highest rate, wasn't unduly punitive in light of their partial compliance, at least. And, you know, the factors they went through in their brief discuss the various ways in which Commerce sort of failed to explain things. So, how is, are you suggesting that under the facts of this case Commerce had no need to explain it or are you suggesting that Commerce did explain it? I'm suggesting, Your Honor, that there's substantial evidence on the record to support it. Substantial evidence to support a conclusion that the rate is not unduly punitive. Yes, Your Honor. And I see my time has expired if I might respond. Well, the first point to that, as was discussed briefly before, is that this was an argument that wasn't raised either before the agency or... Move on from that. I didn't give you extra time to address a different issue. I gave you extra time to address the question I asked. Okay. So, yes, that there's evidence to support that the rate is not unduly punitive, that Commerce is required to show that substantial evidence on the record supports the application of total AFA, which exists in this case. Is that the standard? Am I supposed to, in the first instance, look through the record to see if it's unduly prejudiced or is this really a question about whether Commerce explained itself? Not whether Commerce's determination could ultimately be justified, but whether Commerce explained it. I mean, I'm very sensitive to the idea that I'm only supposed to review the basis upon which agencies made decisions. So if I don't have an adequate explanation, am I supposed to come up with my own based on the record or do I send it back for an explanation? Well, Your Honor, there's no requirement that Commerce specifically explain this punitive question. The requirement is that Commerce substantiate the use of adverse facts Okay. Okay. Thank you. Thank you, Your Honor. Mr. Gordon. Hello again. May it please the Court. Adam Gordon from the Bristol Group on behalf of Midcontinent Steel and Wire. I think I forgot to say that the first time. I would like to just make a couple of points that I think are important to reiterate. Firstly, though, Your Honor had asked about the company's response to Commerce's request that they provide more specific reporting. Pages 6 through 8 of our red brief goes through that back and forth on the record. One thing I would emphasize, though, is that the company's reporting was based on, here's a quote, its material consumption worksheets, its reported input consumption amounts are for total consumption quantities, total consumption quantities, and do not track the monthly consumption of inputs and outputs on a product-specific basis. So what they were the most general type of reporting, allocating their consumption amounts over total production as opposed to even making an effort to get to product-specific reporting. We commented on that. The government asked them again to provide product-specific reporting and, in fact, Commerce wasn't being inflexible on this. They went out of their way to even make a suggestion about how they could create a reasonable reporting methodology. That's detailed on page 7 of our red brief. But in response, the company said that it has always allocated its cost based on the production of each product model and has, quote, no cost records that would support any other allocation methodology. Now, this is revealing in one sense that may not be immediately apparent. This is a non-market economy case where the respondents report factors of production in calculating normal value using surrogate values from a third country. It doesn't rely on cost records. It relies on their production records. So very important that they chose to avoid actually addressing the issue. And even when Commerce gave them a very clear lead on how to develop a methodology, and it's not that difficult when you think about it, you know, it can be very, very varied. Even if there are minute differences, those are relatively very significant when it in order to have complete and accurate reporting, and for Commerce to fulfill its duty, which is to calculate the most accurate margins possible. So we respectfully request that the court affirm the trial court and find that the rejection. The one point I would make is with respect to counsel's suggestion that partial AFA may have been more appropriate. Given what is at issue here, the reporting of input consumption amounts, the factors of production data necessary to calculate normal value, it is entirely unclear how you can take that out of the equation and still have any basis to calculate a margin. So Commerce's resort to the total adverse facts available margin, the all others rate is entirely reasonable in this case. Okay. Thank you, Mr. Gordon. Mr. Dietrich, you have some rebuttal time. Thank you, Your Honors. I have four brief points. First of all, a citation. My friend said that six to eight pages, six to eight of the Mid-Continent Brief in the record, it's Appendix 1043. That's where Pioneer's explanation of why it can't report more specifically appears. There's a colloquy about the difference between a reporting requirement and a maintenance requirement, how to maintain records. On page 10 of our opening brief, we recite in a block quote the entire rule. And if you look at the final paragraph of that rule, it talks specifically about requiring companies to maintain. That's a direct quote from the rule. I also refer the court to the children's health care case from the Eighth Circuit, which said that their reporting requirement was a legislative rule. We cited that in our opening brief. Finally, points three and four that I'm going to make are related. Number one, there was a discussion about substantial evidence and so forth. I want to make clear that there's a difference in the APA between whether something is a rule or not. And then once something is a legislative rule versus a different type of rule. Hennig's Semiconductor said that commerce bears the burden of showing a lack of reasonable cost by substantial evidence. And here, all commerce did was refer to a rule under the APA. And that is not substantial evidence. I welcome the court's questions. Otherwise, I conclude my presentation. I have to admit, when you said I have four points on I thought either you were going to go so fast I wouldn't be able to hear them or there's no way you'd get through them. I'm quite impressed you got through them in a very slow and methodical fashion. That was well done. Thank you. Thank both counsel for their arguments today. This case is taken under submission.